Our next case is No. 24-1792, Tentales, Inc. v. TikTok, Inc., Mr. Fischer. Good afternoon. May it please the Court. Claim 1 of the 03-0 patent is directed to a specific implementation of a new and improved system that solved a problem that was unique to the Internet in 2003, well before the proliferation of social networks. Claim 1 recites a system that requires the retrieval of user social network information and uses that information to select content to modify what is being presented to a user to make the content more impactful on that particular user. Doesn't that sound a lot to you like Intellectual Ventures v. Capital One? It doesn't. And I think that case is instructive for the way how little that claim shows. And that was brought up during oral argument where counsel was asked, does this not read simply on... Well, that case was about customizing a web page. Customizing content. As a function of navigation history and information known about the user. That doesn't sound that different than how you described the user. Tell me how it's different. This is 2003, and I think that's important. Social networks were not yet a thing. The inventor, who has a background in psychology and digital media, came up with the approach of rather than just personalizing digital content based on what the user has told the system about himself, let's go observe and retrieve user social network information that has user attributes in it. That indicate properties about that user's interactions in an online community. And then based on those attributes, select better content and modify what was being presented to the user based on what he had told the system about himself. And improve it so that the system can benefit from... So using, going out and getting, using ten buckets of information versus using two buckets of information about the user makes this eligible versus ineligible? It's the fact that the user's social network information is observing a user's behavior... What do you mean by social network? Are you talking about YouTube? Not YouTube. The social platforms that we have? Well, in 2003, none of them were here. This invention is 2003, which is well before any of the social networks had been out there. We put a timeline in our brief. This was before the first iPhone. This was the concept of interacting in a network. This is shortly after the internet became a thing. Interacting with one another. So you're talking about systems or programs that existed before WhatsApp or Facebook? Before Facebook, yes. Before Facebook. The claim was, the invention was, hey, if users are going to be interacting with one another, let's get information about those interactions. Go retrieve information about those interactions. Use that in addition to what we know about the user. Mail, Vienna, Virginia, football fan. Why is that not targeted advertising, which we've held to be ineligible? Because it's very specific. There's a very specific implementation of a system that requires not only that you select content based on user attributes, but then the system, the technical system... It could be used to advertise, but it's not targeted advertising. It's a system for getting... It improves the target, I'll say. It improves the content. It modifies what is being provided to the user to provide better content. That doesn't improve technology. Sure it does. It's the fact that the system, that you've told the system about yourself, your profile information. That system is going to start providing you information. And it's going to be good information because you told me what your interests are and I gave you information. Again, we have, I think as Judge Reyna pointed out, we've got legions of cases that talk about something that sounds just like this that says ineligible. But the system further requires that it go out and get additional user attributes based on how you are interacting on a social network, on an online community. Maybe it's something you didn't tell the system about. Maybe it's the fact that you hit like on a certain football team in an online community that you're involved with. It's the free stream media it took into account television usage. Free stream was television watching behavior or whatever, right?  Well this is different. This is not... But it's information from another source. Right? This is not just another source. This is information that goes to the user itself. It is information about the user's likes and dislikes, the user's affinities, what content is going to make the user...  I'm sorry? That was true in free stream. I don't think that it... It certainly didn't include social networks. Well you said this patent was filed before social networks existed so the patent wasn't referring to social networks. The user recognized that the capability is coming to be where users could interact with one another in a network environment. As a result of... They were in their infancy. But nobody had ever said that there's a type of information that we can derive from a user based on their interactions in that environment to make content being provided to the user more impactful. There was a problem identified in the patent. Let's say that there's an interaction on this social environment that you're talking about. And a fellow says in there, I like Ford pickup trucks. That is a type of information that would be gleaned as a result of that social interaction, right? Something that you didn't tell the system but that I observed. So then I go home and now I'm getting advertisements for Ford trucks. Or maybe you're watching a movie and a Ford truck appears in it.  Because the content was modified. Why is that not targeted advertising? I'm sorry? Why is that not targeted advertising? That's an implementation of it but the prior art and what was conventional at the time, social networks were not conventional. So the ability... Just aside from all of that, the claims are directed towards advertising, targeted advertising. It's directed to modifying content. It doesn't have to be advertising. Modifying content to make it more impactful on the user. That's what the claims are directed to. And it's a very specific technical implementation. And not only is it not abstract, it has been found to be novel and non-obvious three times. During examination, after surviving a one-on-one... But section 103 has no relevance in section 101 analysis. It does have relevance in the sense that Burkheimer says that the underlying factual inquiries can overlap between novelty and non-obviousness. It's the same factual inquiries in determining whether an invention is non-conventional, non-routine, or well-known in the art. And those factual inquiries can overlap. And here, not only has it been found to be novel and non-obvious three times in the examination and in the IPR that was denied, and TikTok then subsequently filed an ex parte re-exam, and that was denied. In all of those rejections, the examiner, the PTAB, and the CRU all recognized that in 2003, the concept of retrieving user social network information was not in the art. Which I think is pertinent to a finding that that's an inventive concept that adds something more to the claim, to the extent it's found to be abstract. So it's a very specific technical system and embodiment for carrying out the invention. And on a Rule 12 motion, certainly to the extent there's factual disputes, those images need to be taken in favor of 10 tails, and the patent should be found eligible. So the error that the District Court committed at step one was that it simply generalized the claim. It did not consider the claim as a whole. It did not consider that the claim specifically recites retrieving user social network information from a source external. And when you peel away the requirements of the claim, and you're left with targeted advertising. But that's not what this claim is directed to. It's much more detailed than that. And as a whole, there's certainly technology in the claim that warrants eligibility. At step two, what the District Court did was to, again, shorthand what the claim limitations required, and found that there was no intended concept. And as Your Honor indicated, or put to me, is there an overlap between novelty and non-obviousness in eligibility? And I would submit that there certainly is under Berkheimer. And the District Court stated, citing Diamond v. Deere, that evidence of novelty is of no relevance. But, of course, Diamond v. Deere is from well before Alice and well before Berkheimer. So one thing I would like to touch on that neither the District Court nor TICTOC touches on is preemption. And that is the underlying concern of a 101 determination. Are we preempting a building block of ingenuity? And certainly, when the claim is considered as a whole, and there's retrieving user social network information, and there is selecting content and modifying what the user has been presented, it can't be said that Pentail's Claim 1 is preempting targeted advertising, if targeted advertising is a fundamental business practice, which I would agree that it probably is. So TICTOC's brief cites a number of cases where the Court found that targeted advertising is not eligible. But targeted advertising alone, like hedging alone or mitigating settlement risk alone, is a fundamental business practice. But as the District Court first characterized our claim here, it's directed to a system for presenting personalized digital media content to a user based on the user attributes from the user social network information. This is a specific claim system that is not a fundamental business practice. In Alice, while claim comparisons are done in many of these cases, claims to targeted advertising cases, the purpose that the Court in Alice compared the claims to the claims in Bilski was to simply state that the concept of mitigating settlement risk, like the concept of hedging, was a fundamental business practice, which by itself is abstract, because there are building blocks of ingenuity that should not be preempted. But that should not be used as a surrogate for the test at Step 1 and Step 2 of Alice. Thank you. Thank you, Your Honor. Judge Dyke, Your Honors, may it please the Court. I'd like to address a couple of quick issues first and then get into some of the details. The issue with respect to preemption, what the courts have said is that where patent eligibility is established under the Alice framework, preemption concerns are made moot. And the argument, I think, that my friend is making is a little bit in the reverse. The district court didn't address it, and we don't address it because when you go through the Alice framework, we really don't think it comes up. I'd also like to address right off the bat the issue with respect to novelty, because that's a key point of all of their arguments, or most of their arguments are focused on the fact that the examiner allowed the claim to issue and found that the claimed invention was novel over the prior art. But as Your Honor recognized, the Supreme Court, actually, in Diamond v. Deere, had said that novelty and non-obviousness are irrelevant to a finding of patent ineligibility. The statutory requirements under them are different. They're separate. And I think in Mayo they said it'll really make things confusing and complex if you try to conflate the two. So we would reject that. But even if personalizing content using social network information is new, it's still an abstract idea under Step 1 and can't also be an inventive concept, which is what I think they are arguing. The other point that my friend raised was that the district court overgeneralized what the abstract idea was and that the district court should have said, or should have included, use of social network information. But what the district court did is, in looking at what the problem was that the patent was trying to address, you had digital media users who weren't paying attention to the content. It was very easy for them just to swipe through the advertisements. And so how do you get the digital media content users to review the information? The specification goes into excruciating detail about the more information we can get about the user, if we know how the user feels, if we know their favorite football team, we can present information that's more impactful or more personalized, and that would make the users pay attention to the content. Neither the problem that was addressed or the solution that they came up with is a technical one. And so the court found that the abstract idea was presenting personalized content based on information about the user. There's no need, as my friend argues, to insert the type of information. The district court found that user social network information was merely a type of information. And this court has found that gathering or collecting information regardless of the type is an abstract idea. And so it wasn't necessary for the district court to say, you know, let me put this abstract idea into the abstract idea. So I don't think there's an issue there. With respect to, my friend had argued what the invention does, what the claimed invention does. He says that it observes user interactions. It learns about the user's interactions. These were arguments that were made below in order to establish that there was improvement to technology. And they argued to the court that the claimed invention learns and analyzes users' interactions. The claimed invention substitutes information based on a rule-based algorithm. And the court said, well, where is that in the claim? And it wasn't there. But the court granted a claim construction hearing, and Tentales never even attempted to argue that those improvements were in the claim. And then we had the motion to dismiss a second time, and they continued to argue that these improvements of learning and analyzing, they're in the claim, even though they had never argued at the claim construction hearing, at their request, that they were in the claim. But now on appeal and in the Tentales brief, they use language like the invention enhances digital media content. The invention impacts the user. The invention modifies and customizes content in real time during streaming. None of that is recited in the claim. And it certainly wasn't argued below. So on those two bases, I say there are no improvements that would take the claim out of the abstract and into the patent eligible. And even if we did consider it, there's no specificity with respect to any of the programming instructions that provides technical detail on how to accomplish the result. You know, you retrieve user social network information. Great. How do you retrieve it? You look at these attributes. Well, how are you looking at the attributes? If you're going to enhance, oh, let me take a step back. I'm sorry. Modify. I suspect that Tentales will argue that the claim does modify because there is language that says substitute based on a rule. But the court said, you know, substitution based on the rule is any rule. But that's very different from saying that you modify or customize content in real time or while streaming. I've argued or I've litigated streaming patents. And they start talking about encoding and decoding data. They talk about bit streams. They talk about compressing data. None of that is in this particular patent. So I would argue that there are no improvements that take it out of the abstract. And then lastly, my friend argued that there were these plausible allegations that should grant them an inference. This was addressed at the district court as well. In fact, the district court had said in their request to amend, well, what other allegations would you want us to include? And they had none. They couldn't explain what they were. And so here, the allegations that they're trying to rely on are, number one, this novelty argument. But the novelty is irrelevant. And so it doesn't give a plausible reason or a plausible basis to draw an inference. The second thing that they argue, second basis, is regarding the improvements. But as the district court found with the analyzing learning and algorithm improvements, they're not in the claim. They're not supported by the specification. So they can't grant this inference based on conclusory arguments. It's the same here on the appeal, although the language is different. There's nothing in the claim about enhancing. There's nothing in the claim about modifying in real time. The claim doesn't give us the information on how information is derived and so forth. So there are no plausible arguments or plausible facts that would support the inference. And then one final point, and then I'll sit down, because I suspect it was addressed in the brief, and it was the idea of the ordered combination. When you look at the steps that are recited in the claim, the programming instructions, they're set forth in a conventional and routine order that we would follow regardless of what we're personalizing, what type of content. You start with the content. You collect information about the user. You substitute in the personalized content. And then you present it to the user. Those are the same steps you would use if you had a newspaper company and you're trying to personalize ads based on somebody who lives in the suburbs and somebody who lives downtown. It's the same type of process you would follow if you have a TV company and you want to tailor the commercials to the kids who watch the cartoons in the morning or the adults who watch the news at night. Those are the same steps. And we would submit that there's nothing new here other than using social network information. That's what the examiner found was new. But this Court has found that retrieving information or modifying information and the like, whether it's targeted advertising or something more general, is abstract, unless the Court has any other questions. Thank you, Mr. Kornisky. Thank you, sir. Mr. Fisher. So I think what we're doing is we're falling into the trap that we are looking for the lowest common denominator, which by definition is going to mean all patents are ineligible. All patents involve abstract ideas or things that have been known. That's what innovation is. And now we're saying, well, this is targeted advertising. Mr. Kornisky acknowledges it's not just targeted advertising. It also includes social network information. But we don't need to have that in the claim because we don't need to insert that in the claim. It's recited in the claim. And it's an invention that Argyle came up with in 2003 before people were doing it. Now they're making billions of dollars off of having the most impactful feed for a user, and we're saying Argyle doesn't even have an invention. And it's been challenged at examination. It was challenged in an IPR. It was challenged in a re-exam. Confirm, confirm, confirm. And it was directed to a simple idea of targeted advertising. Where's the targeted advertising art to render it invalid? PTAD's looked at it. The CRU just looked at it. It spent $4 million trying to kill this patent, and we're saying it's not even patentable subject matter. It's beyond the pale. And we have to look at what the claim limitations are. We have to look at preemption. Preemption does matter in all cases. Alice made it crystal clear. Preemption is the underlying concern of the judicial exceptions. If we're not preempting a building block of ingenuity, then it's patentable subject matter because it's everything under the sun invented by man. That's what Congress intended. And we've got to get it back to that. They can challenge it again. Okay, thank you. We're out of time.  Thank you, counsel. Please be seated.